JOHNSON COUNTY, Iowa, Appellee,

v.

Sue KRIZ, Appellant.

No. 96–619.

Supreme Court of Iowa.

April 22, 1998.

Rehearing Denied June 15, 1998.

Robert J. Hearity of Hearity Law Firm, Waterloo, for appellant.

Anne Lahey, Assistant County Attorney, for appellee.

Considered by LARSON, P.J., and CARTER, SNELL, ANDREASEN, and TERNUS, JJ.

LARSON, Justice.

The Johnson County District Court found approximately fifty monkeys owned by Sue Kriz to be neglected because they were deprived of food, water, sanitation, and medical care. *See* Iowa Code § 717B.3 (1995). The court ordered the monkeys to be sold or placed in approved sanctuaries or zoos. Kriz appealed, claiming that the court lacked statutory authority to make that disposition. We affirm.

I. *The Facts.*

Kriz confined these monkeys in a combination residence and monkey facility. In December 1995 the Johnson County Sheriff's Office received a report of a possible prowler on the Kriz premises. When officers arrived, they found no prowler, but they found such deplorable living conditions for the monkeys that they made a return trip, this time with a veterinarian. *See* Iowa Code § 717B.5 (law enforcement officer may, after consulting with veterinarian, enter premises to rescue neglected animals).

At about the time the sheriff's department became interested in what was going on at the Kriz residence, Kriz took four monkeys, two alive and two dead, to area veterinary clinics. The veterinarians found that the monkeys were suffering from serious lack of care, and necropsies performed on the dead monkeys confirmed that. Meanwhile, sheriff's deputies continued to investigate the condition of the residence and the monkeys. The officers' testimony and numerous photographs taken on the premises revealed inhumane living conditions. According to one veterinarian, "[t]he facility was totally unacceptable; ventilation, the trash, feces all over the floor. It was just the most awful thing I've ever seen."

The facility had been designed to separate the monkey area from Kriz's residence, but several monkeys were living in the residence, along with a rabbit, birds, and even a prairie dog. Rats, both dead and alive, were found in the monkey area. The whole building was

permeated with a stifling odor of ammonia and animal waste. Animal feces covered the floors. The facility was infested with flies. All of the monkeys appeared to be malnourished. A lack of fresh monkey feces showed that they had not been recently fed or watered.

Kriz, apparently realizing that their health was in danger, had been attempting to arrange placement of the monkeys with a half-sister, Peggy Parker, who was renovating her pet shop in Guthrie Center to house them temporarily. After the sheriff's inspection and before the Guthrie Center placement materialized, Kriz agreed to allow the animal facility at the University of Iowa to house them on a temporary basis.

On December 16, 1995, all of the monkeys were transported to the University of Iowa, where veterinarians confirmed them to be malnourished. Three were given immediate critical care, but one died. The dead monkey was found to be emaciated and anorexic and had shigella flexneri, which is a disease communicable to humans. Two monkeys died soon thereafter, one from a blockage to its colon that was determined to be a blanket or towel that the monkey had attempted to eat. Veterinarians tested all of the monkeys and found one more with shigella flexneri and four with salmonella. One or two had hypoglycemia.

After the monkeys were transported to the university, efforts were made to allow Kriz to make arrangements for a more permanent placement because the placement with the university was to be temporary. However, Kriz was unable or unwilling to cooperate in another placement, resulting in the filing of these proceedings for rescue of neglected animals under Iowa Code chapter 717B.

On January 3, 1996, the Johnson County attorney filed a petition against Kriz, alleging that she had neglected the monkeys and requesting an order for their disposition. *See* Iowa Code § 717B.4. Peggy Parker, Kriz's half-sister, petitioned to intervene and requested that the court release the monkeys to her until conditions at the Kriz facility improved.

The district court heard the matter in equity and ruled that the half-sister had no standing to intervene; it dismissed her petition of intervention. It ordered that "the Johnson County Attorney's Office, with the advice and recommendations of [two veterinarians], shall sell or place the primates in approved, certified sanctuaries and/or licensed or approved zoos." Kriz moved under Iowa Rule of Civil Procedure 179(b) to modify the ruling by ordering that the monkeys be sold at public auction to the highest bidder. She also asked that she be relieved from payment of any additional costs. (She had previously posted a $2160 bond, which the court forfeited.) The court denied the request to auction the monkeys, but it granted Kriz's request to be relieved of any additional costs.

Veterinarians at the university, together with the county attorney, developed a plan for placing the monkeys to comply with the court's order. However, Kriz filed this appeal before the plan could be implemented. We assume that the monkeys are still in the care of the university, pursuant to the parties' initial agreement for their temporary care.

## II. *The Neglect Statute.*

The statutory definitions of animal neglect, procedures for seizing the animals, and provisions for their disposition are found in Iowa Code chapter 717B. Iowa Code section 717B.3 defines the offense of neglect and provides for criminal punishment:

> 1. A person who impounds or confines, in any place, an animal is guilty of animal neglect, if the person does any of the following: fails to supply the animal during confinement with a sufficient quantity of food or water ... or tortures, deprives of necessary sustenance, mutilates, beats, or kills an animal by any means which causes unjustified pain, distress, or suffering.

Section 717B.3 provides for criminal penalties, but no criminal charges are involved in this appeal. Further, Kriz does not challenge the court's finding of neglect, so the only issue is whether the court's order that the monkeys be sold or placed in "approved, certified sanctuaries and/or licensed or approved zoos" was authorized by statute. Kriz says that this disposition was not autho-

rized and that only a public auction or destruction of the animals is allowed.

### III. *The Court's Disposition Order.*

■ Iowa Code section 717B.4 discusses the disposition of neglected animals. Subsection 1 provides for "the immediate disposition ... [presumably destruction as provided by section 717B.4(4)] if the animal is *permanently distressed* by disease or injury to a degree that would result in severe or prolonged suffering." (Emphasis added.) Subsection 3 also contemplates a possible sale. In relevant part, that subsection states:

> 3. A court may order a person owning the neglected animal to pay an amount which shall not be more than the expenses incurred in maintaining the neglected animal rescued pursuant to section 717B.5, and reasonable attorney fees and expenses related to the investigation of the case. The remaining amount of a bond or other security posted pursuant to this chapter shall be used to reimburse the local authority.... The moneys shall be paid to the local authority incurring the expense. The amount shall be subtracted from proceeds owed to the owner or owners of the animal, which are received from the sale of the animal ordered by the court.

Iowa Code § 717B.4(3).

At the time of the court's order, the monkeys were not "permanently distressed" because of the care that had been given to them at the university. The provision for their destruction under section 717B.4 was therefore inapplicable, and the court properly rejected it. Destruction of the monkeys under these circumstances, moreover, would be inimicable to the stated purpose of chapter 717B,[1] especially in view of the fact that at least five of the monkeys are on an endangered species list.

Under the court's order, the monkeys could be sold, but the court did not specify how this was to be accomplished except to state that it should be under the supervision of the county attorney and the veterinarians. Kriz argues that the sale should be at public auction. However, a public auction was discouraged by the experts in this case because of the likelihood that the monkeys would again be in the hands of a private owner, possibly even Kriz herself. One person, even under the most favorable conditions, cannot properly care for fifty monkeys. In fact, at the Blank Park Zoo in Des Moines, it takes three full-time employees and a night keeper to care for just thirty-five of them. Monkeys require specialized veterinarians. They need regular tuberculosis testing and vaccinations. Kriz has had no regularly attending veterinarian, and there was no evidence that the monkeys had been tested on a regular basis.

The care of monkeys is very specialized. Different species require different types of care and different types of habitat. Monkeys are carriers of diseases such as tuberculosis, salmonella, Marburg virus, shigella, Ebola, and Herpes B virus, all of which are dangerous to humans. Testimony showed that monkeys are dangerous to have as pets, and their bites carry a very high risk of infection. In fact, it was the concern of one of the veterinarians about the monkeys' possible health hazard to humans that caused the initial contact to be made with the University of Iowa veterinarians. There was evidence that a majority of zoological veterinarians and primatologists flatly oppose private ownership. A public sale, for all of these reasons, would not be a good idea. In fact, one veterinarian testified that the sale of monkeys at a public auction would be a "disaster."

■ While the statute mentions a sale of the animals, it does not direct it; and it does not even mention a sale by public auction. The statute, we believe, gives the court considerable latitude as to the disposition of neglected animals, and the court was well within the parameters of that latitude here. The type of animal involved obviously should play a large role in that determination, as it did here.

---

1. House File 637, under which the statute was passed, stated its purpose:

   **AN ACT** relating to the care of animals including livestock, by prohibiting the neglect of animals, providing for the rescue, maintenance, and disposition of neglected animals, providing penalties, and providing for the repeal of sections and effective dates.

   1994 Iowa Acts ch. 1103.

■ If Kriz's motivation for a public auction is to maximize her own monetary return, we point out that income to an owner from disposal of neglected animals does not appear to be a significant rationale of the statute; as already discussed, the statute was passed to alleviate animal suffering. It was not intended to maximize income to the owner. As one court has noted:

Indeed, the power to seize and dispose of neglected animals is analogous to the state's traditional power to take action to abate a nuisance or to protect the public health. As such, the state's disposal of neglected animals falls within the class of property deprivations for which the Fifth Amendment does not require compensation.

*Porter v. DiBlasio,* 93 F.3d 301, 310 (7th Cir.1996) (disposition of neglected horses). As a practical matter, a public sale would have no economic benefit to Kriz. Under section 717B.3(3), the cost of keeping neglected animals must be deducted from a sale before any proceeds would be paid to the former owner. The cost of care testified to by the university veterinarians (approximately $8400 for the six-week period preceding trial) would far outstrip Kriz's own valuation of the animals.

We agree that the monkeys should be sold or placed in appropriate animal sanctuaries or zoos under the supervision and recommendations of the veterinarians, as ordered by the district court.

**AFFIRMED.**